**UNITED STATES of America,**

v.

**Criminal Mark McLAUGHLIN.**

**No. CRIM. 95–113.**

United States District Court, E.D. Pennsylvania.

March 15, 2000.

Robert E. Welsh, Jr., Catherine M. Recker, Welsh & Recker, Philadelphia, PA, for Russell McLaughlin, and Mark McLaughlin.

Joseph S. Berarducci, Philadelphia, PA, for Robin McLaughlin.

Maureen Barden, U.S. Atty's Office, Philadelphia, PA, for U.S.

*MEMORANDUM*

GILES, Chief Judge.

Mark McLaughlin ("McLaughlin" or "Mark McLaughlin") was convicted by a jury in 1996 of tax evasion under 26 U.S.C. § 7201. Following vacatur of his sentence on appeal but prior to new sentencing, McLaughlin filed a timely motion for new trial, asserting five grounds for relief: 1) that the government did not meet the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) because it failed to turn over material exculpatory evidence to the defense prior to the trial; 2) that newly discovered evidence requires a new trial under Fed. R.Crim.P. 33; 3) that a chief witness for the prosecution gave perjured testimony; 4) that the Tax Division of the Department of Justice knew that the witness' testimony was false in material respects; and 5) that defense counsel was ineffective.

For the reasons below, defendant's motion is granted. In sum, a new trial is warranted on the bases of *Brady,* newly discovered evidence, and perjured testimony. The ineffective counsel claim is not properly before this court.

### Procedural Background

McLaughlin and members of his family own Building Inspection Underwriters ("BIU"), a closely held corporation that conducts building inspections for various New Jersey and Pennsylvania municipalities; he was vice president. McLaughlin, along with his brother Russell McLaughlin, Jr., was indicted on March 9, 1995 on various federal charges, the thrust of which was a willful evasion of income taxes. On May 11, 1995, a superseding indictment was filed, adding Robin McLaughlin as a defendant and containing three counts: conspiracy, tax evasion, and signing a false tax return. All three defendants were acquitted on the conspiracy charge (the only count in which Robin was named). Mark McLaughlin and Russell McLaughlin were convicted of tax evasion

and Russell McLaughlin was convicted of signing a false tax return.[1]

The guilty verdicts were filed on March 13, 1996. Following sentencing, the two brothers appealed to the United States Court of Appeals for the Third Circuit. On September 11, 1997, the third circuit reversed Russell McLaughlin's conviction and sentence and granted him a new trial because of certain trial errors unrelated to the present motion. Mark McLaughlin's conviction was affirmed, but his sentence was vacated and he was ordered resentenced. *See United States v. McLaughlin,* 126 F.3d 130 (3d Cir.1997). Mark McLaughlin's petition for writ of certiorari to the United States Supreme Court was denied on June 26, 1997. *See McLaughlin v. United States,* 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998).

Mark McLaughlin moved for a prompt sentencing on August 11, 1998; the government opposed the motion and, with the eventual concurrence of the parties, the court postponed the sentencing of Mark McLaughlin until after the completion of Russell McLaughlin's new trial. Russell McLaughlin was re-tried before a jury in November, 1998, the Honorable Robert S. Gawthrop III presiding, and was acquitted of the remaining charges.

On March 15, 1999, subsequent to his brother's acquittal, Mark McLaughlin filed a timely motion for a new trial. The case was transferred to the docket of this court following Judge Gawthrop's death in the summer of 1999. McLaughlin sought a new trial based on perjured testimony, *Brady* violations, newly discovered evidence, the government's knowing use of perjured testimony, and ineffective assistance of trial counsel. Hearings were held on October 28, November 1, November 15, and November 16, 1999. Among the witnesses who testified were Melvin Cherry ("Cherry"), William St. Clair ("St.Clair"), and Deborah Malloy Costello ("Malloy").

## Factual Background

BIU maintained bank accounts, one at New Jersey National Bank ("NJNB") and the other with First Fidelity Bank ("First Fidelity"). More than $700,000 in corporate receipts were deposited into each of these accounts but not declared as income on BIU's 1988 federal corporate tax return. The failure to declare the deposits from these accounts formed the basis for the tax evasion charges. BIU's 1988 corporate tax return was prepared by two different accountants. Cherry was BIU's outside accountant from the early 1980s until early in 1989. Upon Cherry's resignation, he was replaced by St. Clair, who completed the 1988 return.

In the 1996 trial, McLaughlin claimed that the failure to report the income was based on either his, or the accountants', belief that the relevant accounts were established for warranty reserves. Home warranties are a form of insurance, purchased by home builders, under which BIU guaranteed that it would pay for certain home repairs if any construction defects were discovered within a certain time period after purchase of the home. Under law, warranty sellers may accumulate collected warranty fees in a bank account to insure that there will be funds available to pay the costs of any warranty repairs that may be required in subsequent warranty years. As such, warranty fees have tax-deferred status and do not have to be declared as income in the year collected, but in the year when the warranty fee no longer can be treated as a reserve against possible repair obligations. The time period for converting fees into reportable income is not at issue here. McLaughlin claimed that BIU maintained such a warranty account in the Delaware Trust Bank, Account No. 119–171–3 ("Delaware Trust Account").[2] He testified that BIU had reported warranty fees deposited in that

---

1. Russell McLaughlin signed the tax returns in question; Mark McLaughlin did not.

2. McLaughlin was not charged with tax evasion relative to the Delaware Trust Account, although this account is central to the present motion.

account as income on its corporate tax returns in the early 1980s. BIU allegedly wanted to use some of its 1988 income as a warranty reserve for those warranties sold in the early 1980s on which taxes had been paid. To the extent that income not used as warranty reserves was omitted from the 1988 tax return, McLaughlin claimed such was an unintentional omission caused by one or both of the outside accountants.

In closing arguments at the 1996 trial, the government argued from the evidence that McLaughlin purposely hid the existence of the Pennsylvania and New Jersey bank accounts at issue in the case from BIU's outside accountant, Cherry, based on Cherry's testimony that he had never heard of them. McLaughlin had no direct corporate responsibility for the opening, maintenance, or use of those accounts. There was a direct connection, however, between McLaughlin and the Delaware Trust Account. According to the government, Cherry also did not know of the existence of the Delaware Trust Account and that lack of knowledge was caused by McLaughlin, to whom the bank account statements were mailed by the BIU Delaware office. The government argued in closing that McLaughlin had the ability and intent to participate in hiding the New Jersey and Pennsylvania accounts because he had regularly hidden the Delaware Trust Account from Cherry. Government counsel stated, "These defendants hid money in 1988 to the tune of about 720 thousand dollars. They knew how to do it. They had been doing it for years with the Delaware Trust account." (N.T. Trial 3/12/96, p. 145).

Next, the government successfully undermined McLaughlin's "warranty reserve" theory by arguing from the evidence that BIU was never significantly engaged in the business of selling warranties and that McLaughlin therefore could not possibly have thought that 1988 income could be used as reserves for warranties

sold in the early 1980s. In support of this, the government emphasized Cherry's testimony that he never knew anything about the Delaware Trust Account, the account said to contain the warranty reserves. In addition, the government pointed to the opinion testimony of FBI Special Agent Tengood that a Delaware Trust Account represented on a 1980 worksheet prepared by Cherry was not in fact a BIU account. (N.T. 3/12/96, p. 134–35).[3]

Sometime after his conviction, McLaughlin discovered certain disbursement journals and bundled bank statements that suggested that Cherry lied at the first trial when he claimed he never knew about the Delaware Trust Account. At Russell McLaughlin's new trial in 1998, when Cherry was confronted with this new evidence, he admitted, contrary to his testimony at the 1996 trial, that he did know about the Delaware Trust Account and that he had seen bank statements from that account.

### Analysis

I. *New Trial Based on Perjured Testimony*

 The use of perjured testimony may provide an independent basis for a new trial. To grant a new trial on this ground, this court must be satisfied that: 1) the testimony given by a material witness was false; 2) the jury might have reached a different conclusion; and 3) the party seeking a new trial was surprised by the false testimony and unable to meet it, or did not know of its falsity until after trial. *See United States v. Bales,* Crim. No. 95–149, 1997 WL 825245, *3 (E.D.Pa. 1997) (Padova, J.) (quoting *United States v. Enigwe,* Crim. No. 92–257, 1992 WL 382325, *6 (E.D.Pa.1992) (DuBois, J.)). This is an alternative to the test ordinarily applied on motions for new trial based on newly discovered evidence. *See United States v. Meyers,* 484 F.2d 113, 116(3d

---

**3.** Actually, Agent Tengood's opinion was based entirely on the assumption that Cherry's testimony was true. Tengood has no independent, objective basis to support the asserted opinion. (N.T. 3/6/96, pp. 15–22).

Cir.1973) (stating that a different test controls where a new trial is sought based on the assertion that evidence at trial was perjured).[4] Although the third circuit never flatly adopted this as the controlling standard in cases where a defendant seeks a new trial based on perjured testimony or evidence, the court has applied this standard in reviewing such cases. *See United States v. Massac,* 867 F.2d 174, 178 (3d Cir.1989); *Meyers,* 484 F.2d at 116–17. And the court of appeals has granted new trials under this standard. *See id.* at 117 (reversing district court and granting new trial where perjured and incorrect testimony resulted in tainted conviction that "should not be permitted to stand"). This court finds that Cherry testified falsely in the 1996 trial, that the outcome of the case was strongly affected by those false statements, and that McLaughlin was surprised by and unable to meet that false testimony. Cherry's false testimony so impacted the jury's verdict that the verdict should not be permitted to stand. *See Meyers,* 484 F.2d at 117. McLaughlin therefore is entitled to a new trial at which the government may present its case against McLaughlin free of Cherry's false testimony. *See id.*

A. Cherry's False Statements

On direct examination during the 1996 trial, Cherry[5] testified that he had no knowledge of any account at the Delaware Trust Bank. He also stated that he never had seen any statements from the Delaware Trust Account.[6] During cross-examination, even when defense counsel confronted Cherry with a worksheet entitled "BIU Pride of Delaware Cash Receipts 1980," on which Cherry had made entries from the Delaware Trust Account, Cherry stated that the entries must have pertained to some other account. (N.T. 2/27/96, pp. 124–26). By contrast, at Russell McLaughlin's second trial in 1998, Cherry was confronted with newly discovered evidence that he had handled the Delaware Trust Account in his capacity as BIU's accountant. At that point, Cherry admitted that he indeed knew about the account. (N.T. 11/18/98, p. 61). He also admitted that he had balanced the checkbook of the account for at least three years and had included some deposits in that account as income for BIU. (N.T. 11/18/98, pp. 71–73). Further, Cherry acknowledged that the "BIU Pride Of Delaware Cash Receipts 1980" worksheet was a work paper accounting for the Delaware Trust Account. (N.T. 11/18/98, pp. 71–73).

It has not been explained to this court's satisfaction why Cherry's memory changed so drastically between 1996 and 1998. This court therefore must find that the trial testimony he gave in 1996 was false. At the 1996 trial, Cherry did not testify that he could not recall the account or that his recollection could be faulty. Rather, he adamantly and repeatedly stated that he had no knowledge of the account. This is the same position he asserted before the grand jury and in an affidavit to the Tax Division of the Department of Justice. On cross-examination, he testified emphatically and repeatedly that he did not know about the Delaware Trust Account and that no statements concerning the account ever came to his attention. For purposes of determining whether a witness testified falsely, there is a substantial difference between a witness testifying that he did not recall some fact and a witness affirmatively denying knowledge of that fact; Cherry's testimony falls in the latter category. Cherry's current admission that he

4. The standard for the grant of a new trial based on newly discovered evidence is discussed and applied *infra* Part III.

5. There is no suggestion that Cherry was not a material witness at the 1996 trial.

6. His testimony was as follows:

Q: Were you, during the course of your employment were you provided with any records from the Delaware Trust Account?
A: No.
Q: Were you aware of any Delaware Trust account affiliated with the McLaughlins or these entities?
A: No.
(N.T. 2/27/96, pp. 96–97).

actually knew about the Delaware Trust Account commands the conclusion that Cherry's contrary testimony in 1996 was false.

When confronted with evidence of his administration of the subject account in Russell McLaughlin's 1998 trial, Cherry attempted to explain his earlier denials of knowledge by saying that he construed the question to relate to his knowledge of an account at the time of the interview or questioning. (N.T. 11/19/98, pp. 63, 67–68, 99). He said that he understood the questions as asking whether he knew about an account existing at the time of his affidavit given to the Tax Division in 1990, his grand jury testimony in 1994, and his trial testimony in 1996. This interpretation tortures the contours of reasonableness and the record and this court rejects it.

In the hearing on this motion, Cherry testified that he simply could not recall the Delaware Trust Account when he gave his earlier denials, that he simply "had no recollection." (N.T. 11/1/99, pp. 12–13). Again, not recalling whether something happened, his testimony before this court on this motion, is a far cry from stating that something never happened at all, which was his testimony at the 1996 trial. Cherry had to know that difference in 1996, yet persisted in maintaining at that time that he never knew about the account in question.[7] Based on the dramatic and unexplained change in his testimony since the 1996 trial, this court is satisfied that Cherry's trial testimony was false and knowingly false.

B. Significance of Cherry's False Testimony

Cherry's testimony allowed the government to argue that McLaughlin purposely kept Cherry in the dark about the Delaware Trust Account. From this, the government was able to argue for the inference that McLaughlin had the knowledge, the ability, and the intent to hide bank accounts from the accountant, as he had done so with the Delaware account, and thus to engage in willful tax evasion. The government now argues that Cherry's testimony was not perjurious and, even if it were, it was not significant, given the other evidence in the case. This court disagrees. The fact that Cherry lied about his knowledge of the Delaware Trust Account could have had a significant effect on the outcome of the 1996 trial and, absent this false testimony, a jury might have reached a different conclusion. This court finds that the impact of Cherry's false testimony so tainted the government's case that the jury verdict based on that false testimony should not be permitted to stand. *See Meyers*, 484 F.2d at 117.

Whether Cherry knew about the Delaware Trust account was an important issue at trial and a change in this testimony might have changed the jury's verdict. The government attacked McLaughlin's credibility through Cherry and the handling of the Delaware Trust Account and the government relied heavily on Cherry's testimony in its closing arguments. First, the government used Cherry's alleged lack of knowledge of the account to claim that BIU was never significantly engaged in the warranty business in Delaware:

> Remember that Mr. Cherry did not have the statements for those accounts, for that account. Now there has been a lot of testimony here about some PRIDE, Inc., income that showed up in his 1980 work papers. We know that. We also know there was no reference on that work paper to any bank account of any kind, or to any bank, even Delaware Trust. It didn't say Delaware Trust, just says PRIDE on it.
>
> We know that Agent Tengood offered his opinion that that account was not in fact at Delaware Trust. We also know

7. Q. Now can you testify Sir—remember you are under oath—that you did not know about the Bank of Delaware ... Trust Company account?

A. That is correct.
(N.T. 2/27/96, p. 125).

when you get to Mr. Cherry's '83 and '84 work papers, and remember now, this is all before Homes Built With Pride was established, it is not anywhere on there. It is not there. He didn't know about it; he didn't have the Delaware Trust statements.

So what this account amounted to was an account that was 100 percent within the control of the defendants. They could do absolutely anything they wanted with that money, and nobody was going to be asking any questions. Claire Layton didn't have the books, she wasn't writing the checks. Mel Cherry didn't have the income statements, didn't have the cash receipts books, didn't have anything from which he would raise any questions about that account. It was an account totally within their control like a cash business, they could do anything they wanted. They could also pay the warranty claims out of it if they wanted to, sure, but they could do anything they wanted to do.

(N.T. 3/12/96, pp. 134–35).

Second, proof that Cherry knew about the account could have helped counter the government's suggestion that McLaughlin was in the practice of hiding bank accounts from his accountants.[8] In particular, the government emphasized that the Delaware Trust Account statements were mailed to McLaughlin, yet never seen by Cherry. From this, the government argued for the inference that McLaughlin actively and intentionally hid the Delaware Trust Account from Cherry and that McLaughlin therefore easily could have hidden the NJNB and First Fidelity accounts because

he and his co-defendants knew how to do it and had been doing it for years. (N.T. 3/12/96, p. 145). However, the jury would have been much more likely to find that McLaughlin had not hidden the NJNB and First Fidelity accounts, and that any underpaid taxes were unintentional, if the jury did not believe, based on Cherry's false testimony, that McLaughlin had hidden the Delaware Trust Account from Cherry.

### C. Government's Arguments About Cherry's Testimony

The government argues that the fact that Cherry changed his position about knowledge of the Delaware Trust Account is not significant because Cherry was extensively impeached regarding his knowledge of that account at trial. Moreover, evidence that Cherry lied about the account added little to all the evidence that the defense provided of Cherry's knowledge of the account at the 1996 trial. The government suggests, in essence, that McLaughlin was given the opportunity to meet the false testimony at trial.

■ This argument fails. In its closing the government emphasized Cherry's lack of knowledge of the Delaware Trust Account: "Remember that Mr. Cherry did not have the statements ... for that account.... He didn't know about it; he didn't have the Delaware Trust statements." (N.T. 3/12/96, pp. 134–35). Absent Cherry's false testimony, the government would have been unable to make that argument from the evidence. The mere opportunity for a defendant to cross-exam-

---

**8.** In opening argument, the prosecutor explained to the jury that an element of tax evasion was that "defendants acted on purpose, acted willfully. It wasn't some mistake that over a million dollars in receipts is not reported on the BIU tax returns, that it was done intentionally and willfully." (N.T. 2/27/96, p. 11). Though the government offered other indicia that McLaughlin's evasion was intentional, the prosecutor especially emphasized Cherry's lack of knowledge about particular bank accounts. For example, when discussing the purposefulness of

McLaughlin's tax evasion in opening argument, the jury was told:

> *Most importantly,* you will hear from a gentlemen named Melvin Cherry who was the BIU accountant and return preparer during 1985, 86, and 87 up until the end of 1988, and he is going to testify at the time he was working on his schedules and his summaries, getting ready to, during the year to prepare the 1988 tax return, he knew nothing about [the NJNB] account. He never saw a bank statement for this account.

(N.T. 2/27/96, p. 11) (emphasis added).

ine or impeach a witness does not meet or cure that witness' perjury. This is especially true given that McLaughlin had no reason to believe prior to trial that Cherry would deny knowledge of the Delaware Trust Account and therefore to prepare evidence to counter that testimony. Rather, absent Cherry's false testimony, the government would have been unable to contend that Cherry did not know about that account and McLaughlin would have been able to show that Cherry did indeed know about the account. McLaughlin therefore was surprised by Cherry's false testimony and did not have the opportunity to meet or counter it.

## II. *New Trial Based on Brady Violations*

■ McLaughlin next argues that he is entitled to a new trial based on the government's violation of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the government in a criminal prosecution to disclose to an accused all favorable material evidence. Whether a *Brady* violation occurred is a two-part inquiry. First, the prosecution must have failed to disclose "evidence favorable to an accused" that is relevant either to guilt or punishment. *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194). Evidence relevant to guilt or punishment includes both exculpatory and impeachment evidence. *Strickler,* 119 S.Ct. at 1948 (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Second, the undisclosed evidence must be material, meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler,* 119 S.Ct. at 1948 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). McLaughlin argues that the government failed to disclose two pieces of

evidence prior to the 1996 trial in violation of his rights under *Brady.* This court considers each part of this test in turn.

## A. Failure to Disclose Grand Jury Testimony

■ McLaughlin first argues that the government violated *Brady* by failing to disclose Malloy's grand jury testimony prior to the 1996 trial. Malloy has been a secretary for BIU since 1981. She testified before a grand jury in 1995 about the procedures that she followed with bank statements that came into her office. She explained that when bank statements were mailed to the Philadelphia office, she placed the statements on Cherry's desk.[9] McLaughlin established through other evidence that statements for the Delaware Trust Account were sent from BIU's Delaware office to the office where Malloy worked. The government did not disclose Malloy's testimony prior to the 1996 trial and Malloy was not called by the defense to testify there. Applying the two-part *Strickler* test to this evidence, this court concludes that the failure to disclose the grand jury testimony to McLaughlin prior to the 1996 trial was a *Brady* violation.

First, Malloy's testimony clearly was relevant to Mark McLaughlin's guilt or innocence. Whether Cherry knew about the Delaware Trust Account was an important issue at trial. The government used his alleged lack of knowledge of the account to show that BIU never was significantly engaged in the warranty business in Delaware and to show that McLaughlin knew how to hide bank accounts from his accountants. Further, Cherry's credibility regarding his lack of knowledge about all relevant bank accounts would have been significantly undermined if he were shown to have been incorrect when he testified that he never knew about the Delaware Trust Account. Similarly, Malloy's testi-

---

**9.** Well, in the beginning, I would give everything to Mark [McLaughlin], so he would look at it. And then he said—and then he would tell me that you can just leave the statements here [on the accountant's desk], and the accountant would take care of them. And that's what I did.

(N.T. Grand Jury 4/6/95, p. 39).

mony was "evidence favorable" to McLaughlin, as it could have countered all three of those points of the government's case.

Second, there is a reasonable probability that, had the grand jury testimony been disclosed and Malloy called to testify for the defense at trial, the result of McLaughlin's trial would have been different. *See Strickler*, 119 S.Ct. at 1948. It is not necessary for this court to conclude that it is probable that McLaughlin would have been acquitted had the government disclosed the grand jury testimony in order to find a *Brady* violation. *See Bagley*, 473 U.S. at 680, 105 S.Ct. 3375. This court need only conclude that the probability that the outcome would have been different is high enough to "undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. 3375 (citing *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). *See also Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.") This inquiry about the probability of a different outcome includes "possible effects of non-disclosure on the defense's trial preparation." *Government of the Virgin Islands v. Martinez*, 780 F.2d 302, 306 (3d Cir.1985).

This court is not confident that the result of the first trial would have been the same had the grand jury testimony been disclosed to the defense. Most importantly, the defense did not call Malloy to testify at trial. It is reasonable to conclude, however, that had the defense known about her grand jury testimony and the substance of her statements, she would have been called to testify at trial and to provide support for McLaughlin's position that he did not hide the Delaware Trust Account, or any other bank accounts, from Cherry. Non-disclosure of Malloy's testimony therefore likely affected the defense's strategic trial decision of whether or not to call her as a witness, which in turn likely affected the outcome of the trial.

Further, Cherry's lack of knowledge of the Delaware Trust Account was highly relevant to the government's case and a constant point of emphasis. The government used his lack of knowledge to support its theory that BIU was not significantly engaged in the warranty business. Evidence from Malloy that the Delaware Trust Account statements were placed on Cherry's desk could have undermined this theory. The issue of whether McLaughlin intentionally hid bank accounts, as well as Cherry's credibility when he claimed not to know about other relevant bank accounts, also were crucial to the government's case.

There is a reasonable probability that Malloy's testimony would have affected the jury's view of all this evidence and therefore would have affected the jury's result. Cherry's credibility could have been significantly undermined through Malloy's testimony about BIU office practices. If Cherry could have been shown to have testified falsely about the Delaware Trust Account, the jury would have been much less likely to believe him when he claimed not to know about the NJNB account.[10] Also, McLaughlin's defense would have been bolstered had he been able to present evidence demonstrating that he did not hide the Delaware Trust Account from Cherry; the defense could have used Malloy's testimony to show that McLaughlin took affirmative steps to alert his accountant to the existence of Delaware Trust Account statements. This would have made it more likely that the jury could have concluded

---

10. Malloy's testimony also would have helped McLaughlin to meet Cherry's perjured testimony. Therefore, the failure to disclose this evidence in violation of *Brady* exacerbates the manner in which Cherry's false testimony tainted the original trial and enhances the existence of perjured evidence as an independent basis for granting a new trial. *See supra* Part I.

that McLaughlin was not in the practice of hiding the Delaware Trust Account, or any other accounts, from his accountants.

## B. Failure to Disclose File of New Castle County Department of Public Works

■ McLaughlin also argues that the government violated *Brady* by failing to disclose a file it had in its possession. The file was from the New Castle, Delaware Department of Public Works and contained correspondence and forms suggesting that BIU was indeed engaged in the business of issuing home warranties. Applying the two-part *Strickler* test to this evidence, this court concludes that the failure to disclose it to McLaughlin prior to the 1996 trial was a *Brady* violation.

This file is relevant to McLaughlin's guilt or innocence because, as explained above, the government argued that BIU never was significantly involved in the business of selling warranties, thereby challenging McLaughlin's defense that certain income was used as warranty reserves and that he did not intentionally fail to pay taxes. The file also is favorable to McLaughlin because it shows that BIU did sell home warranties. Finally, this court is not confident that the outcome of the 1996 trial would not have been different had this information been disclosed to the defense. There is a reasonable probability that the jury would have believed that the Delaware Trust Account was a warranty reserve account had the jury been presented with evidence showing that BIU was engaged in the warranty business; the jury therefore might have reached a different verdict.

## C. Remedy for *Brady* Violation

Each piece of undisclosed evidence, standing alone, was relevant to McLaughlin's guilt or innocence, favorable to McLaughlin, and material. Taking both together, a reasonable person cannot be confident that the jury would have reached the same result in the 1996 trial had these materials been available to the defense. Non-disclosure of this evidence therefore constitutes a *Brady* violation. The appro-

priate remedy for that violation is for McLaughlin to receive a new trial. This ensures that he will have the opportunity to make full use of the exculpatory evidence. *See United States v. Coleman,* 862 F.2d 455, 458–459 (3d Cir.1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989). This remedy also furthers the societal interest in prosecuting criminal defendants to conclusion. *See id.*

## III. New Trial Based on Newly Discovered Evidence

McLaughlin also seeks a new trial under Fed.R.Crim.P. 33 based on relevant evidence discovered since the 1996 trial. While culling through early records in order to free up new storage space, McLaughlin found disbursement journals and bundled bank statements from the Delaware Trust Account that, he argues, further demonstrate that Cherry was incorrect when he testified at the 1996 trial that he did not know about the Delaware Trust Account.

Rule 33 allows this court to grant a new trial based on "newly discovered evidence" if "the interests of justice so require." Fed.R.Crim.P. 33. In the third circuit, the well-established five-part test for a new trial based on newly discovered evidence requires a defendant to meet the heavy burden of showing:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; ( c ) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Adams,* 759 F.2d 1099, 1108 (3d Cir.) (quoting *United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir. 1976)), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985); *see also Mey-*

*ers,* 484 F.2d at 116. This court looks to each of these factors in turn.

First, it is undisputed that the evidence at issue was discovered only since the end of the 1996 trial. Second, McLaughlin was diligent in discovering the materials in question. McLaughlin was aware that Cherry knew of the Delaware Trust Account and had no reason to know or believe that Cherry was going to claim lack of knowledge of the account at trial. Prior to the 1996 trial, therefore, McLaughlin had no reason to search storage boxes for proof of Cherry's knowledge of the account. A criminal defendant, who has no burden of proof at trial, cannot be held at fault for not anticipating the perjury of a chief government witness and searching for evidence through which he could prove that perjury. Only after the first trial, having heard Cherry's false testimony and having understood the importance of it to the jury, did McLaughlin have cause and incentive to search these files in order to prove that perjury.[11]

Third, the newly discovered evidence is not merely cumulative or impeaching. *See Adams,* 759 F.2d at 1108 (finding "merely impeaching" the newly discovered evidence of a witness' past crime where twenty other instances of the witness' unsavory conduct already were produced at trial). Unlike any evidence brought out in the 1996 trial, the disbursement journals and bundled bank statements provide documentation that Cherry made notes and handled statements regarding the Delaware Trust Account. Further, this evidence does more than merely impeach Cherry; it supports McLaughlin's defense about BIU's use of warranty reserves in the Delaware Trust Account.

Finally, the newly discovered evidence was both material to the issues in the 1996 trial and probably would produce an acquittal if presented at a new trial. As stated above, the government's proof that McLaughlin engaged in tax evasion rested heavily on its contention that he hid the existence of the Delaware Trust Account from Cherry. This newly discovered evidence is conclusive proof that Cherry did indeed know about that account and therefore counters several aspects of the government's theory of the case. A jury seeing this evidence likely would acquit McLaughlin at a new trial. Further, Malloy's testimony and the file from the New Castle County Department of Public Works, neither of which was disclosed prior to the first trial in violation of *Brady,* see *supra* Part II, also may be considered newly discovered evidence for Rule 33 purposes. This court finds an acquittal even more probable if McLaughlin can present at his new trial both the *Brady* evidence and the bundled bank statements and notes discovered in his files.

The evidence found in McLaughlin's records, the bundled bank statements and disbursement journals, satisfy the *Adams* standard for granting a new trial based on newly discovered evidence. This court therefore holds that McLaughlin is entitled to a new trial on this basis.

## IV. *New Trial Based on Knowing Use of Perjured Testimony*

McLaughlin also seeks a new trial on the ground that the government knowingly used Cherry's perjured testimony to obtain a conviction. McLaughlin does not suggest that the prosecutor in the 1996 trial knew Cherry was committing perjury, but rather that the government "should have known of Melvin Cherry's perjury based upon information with[in] the knowledge and possession of the Tax Division of the United States Department of Justice, the United States Attorney's Office for the Eastern District of Pennsylvania and the Philadelphia Office of the Internal Revenue Service." (Def. Proposed Findings of Fact and Conclusions of Law as to Motion for a New Trial Under Rule 33, pp. 24–25).

---

11. Again, McLaughlin was surprised by Cherry's false testimony as to knowledge of the Delaware Trust Account and this evidence, found only after the 1996 trial, would have enabled him to meet that perjury at the 1996 trial. *See supra* Part I.

The Supreme Court has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). This rule seems also to apply whether the prosecution knew of the perjury or merely "should have known" of the perjury. *See id.* However, because this court grants a new trial based on the presence of the perjured testimony, the *Brady* violations, and newly discovered evidence, it is unnecessary to reach and resolve the factual question of whether the prosecution in the first trial knew or should have known that Cherry was committing perjury based on information in the possession of various federal offices.

V. *New Trial Based on Ineffective Assistance of Counsel*

Finally, McLaughlin moves for a new trial under Fed.R.Crim P. 33 based on ineffective assistance of counsel.[12] He argues that trial counsel was constitutionally ineffective for three reasons: 1) counsel did not request a full search of BIU's and McLaughlin's storage boxes, resulting in a failure to uncover Cherry's disbursement journals and bundled bank statements; 2) counsel failed to use the notes of St. Clair, McLaughlin's accountant after Cherry left, to impeach or resurrect St. Clair's testimony during trial; and 3) counsel failed to impeach Cherry with his testimony from a previous state court proceeding.

Rule 33 requires that defendants make motions for new trials "within 7 days after the verdict or finding of guilty or within such further time as the court may fix within the 7 day period" unless the motion is "based on newly discovered evidence." Fed.R.Crim.P. 33. Since well over seven days have passed since the 1996 verdict, and since the court did not fix a time for a new trial within seven days of that verdict,

this court only can grant the motion for a new trial at this time if based on newly discovered evidence, as discussed *supra* Part III.

 However, the third circuit has held that a Rule 33 motion for a new trial based on newly discovered evidence is not a proper vehicle for bringing claims of ineffective assistance of counsel. Newly discovered evidence under Rule 33 must be evidence that the attorney from the previous trial could not have found in time for the earlier trial even if he was exercising due diligence. *See Adams,* 759 F.2d at 1108. By contrast, an ineffective assistance of counsel claim requires that "counsel's performance fell 'outside the wide range of professionally competent assistance.' " *United States v. DeRewal,* 10 F.3d 100, 104 (3d Cir.1993) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994). Under the third circuit's approach, these two categories of evidence are mutually exclusive. *See DeRewal,* 10 F.3d at 104. McLaughlin cannot claim that his previous counsel was both diligent in searching but not finding the evidence in question and acting outside the wide range of professional competence when he did not discover the evidence. *See id.* Further, the third circuit suggested that newly discovered evidence generally must be evidence related to factual issues at trial, not evidence related to separate legal issues such as ineffective assistance of counsel. *See id.* McLaughlin therefore cannot bring his ineffective assistance of counsel claim on a Rule 33 motion and this court will not address this argument. McLaughlin would be able to bring an ineffective assistance claim on a motion to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255. However, because he is not presently under any sentence of this

---

**12.** McLaughlin is represented on this motion by different counsel than represented him at the 1996 trial.

court, such a motion is premature and this court cannot consider the instant Rule 33 motion as a § 2255 petition. *See United States v. Robles*, 814 F.Supp. 1233, 1239 n. 4 (E.D.Pa.1993) (Van Antwerpen, J.) (stating that § 2255 petition was premature where defendant had not been sentenced and therefore was not "in custody under sentence" as required by statute).

### Conclusion

For the above reasons, a new trial is warranted and is granted.

An appropriate order follows.

### *ORDER*

AND NOW, this ___ day of March 2000, upon consideration of Mark McLaughlin's Motion for a New Trial Pursuant to Rule 33, and the arguments of the parties, for the reasons stated in the attached Memorandum, it hereby is ORDERED that the Motion is GRANTED.